# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

700 Pharmacy, : CASES CONSOLIDATED
                       Petitioner :
                             :
           v. : No. 560 C.D. 2020
                             :
Bureau of Workers' Compensation :
Fee Review Hearing Office (State :
Workers' Insurance Fund), :
                  Respondent :


State Workers' Insurance Fund, :
                       Petitioner :
                             :
           v. : No. 617 C.D. 2020
                             : Argued: April 9, 2024
Bureau of Workers' Compensation Fee :
Review Hearing Office (700 Pharmacy), :
                  Respondent :


BEFORE:    HONORABLE RENÉE COHN JUBELIRER, President Judge
                 HONORABLE LORI A. DUMAS, Judge
                 HONORABLE MATTHEW S. WOLF, Judge

OPINION BY
PRESIDENT JUDGE COHN JUBELIRER      FILED: May 16, 2024

In this case, 700 Pharmacy (Pharmacy) and State Workers' Insurance Fund (Insurer) cross-petition for review of the decision and order of Hearing Officer David Torrey (Hearing Officer) of the Bureau of Workers' Compensation Fee Review Hearing Office (Bureau) denying and dismissing five fee review applications (Applications) Pharmacy brought in connection with prescriptions it filled for a

claimant.[1]  Insurer argues the Hearing Officer erred in concluding Pharmacy, staffed by a pharmacist provided by an employee leasing agency, amounts to a provider as defined by Section 109 of the Workers' Compensation Act (Act),[2] 77 P.S. § 29, with standing to bring a fee review application under Section 306(f.1)(5) of the Act, 77 P.S. § 531(5).  (Insurer Petition for Review ¶ 9.)  Pharmacy argues the Hearing Officer erred in concluding the prescriptions forming the basis of the Applications were the product of an unlawful self-referral under Section 306(f.1)(3)(iii) of the Act, 77 P.S. § 531(3)(iii) (anti-referral provision).[3]  (Pharmacy Petition for Review ¶ 8.)  After careful review, we affirm.

---

[1] Applications MF-579322, MF-580826, and MF-584389 involve three separate bills of $1,081.95 relating to prescriptions for Ibuprofen 800-milligram tablets, Metaxalone 800-milligram tablets, Metanx capsules, and Endocet 10 325-milligram tablets.  (Reproduced Record (R.R.) at 31a-34a; 49a-53a; 64a-67a.)  Application MF-582819 involves a bill of $7,696.92 relating to prescriptions for Gabapentin powder, Flurbiprofen powder, Ketamine HCL powder, and menthol crystals.  (*Id.* at 80a-83a.)  Application MF-586097 does not appear in the Reproduced Record.

[2] Act of June 2, 1915, P.L. 736, *as amended*, added by Section 3 of the Act of July 2, 1993, P.L. 190, 77 P.S. § 29.  More specifically, Section 109 defines "provider" as "health care provider," which in turn is defined as

> any person, corporation, facility or institution licensed or otherwise authorized by the Commonwealth to provide health care services, including, but not limited to, any physician, coordinated care organization, hospital, health care facility, dentist, nurse, optometrist, podiatrist, physical therapist, psychologist, chiropractor or pharmacist and an officer, employe or agent of such person acting in the course and scope of employment or agency related to health care services.

*Id.*  Accordingly, we use "provider" and "health care provider" interchangeably.

[3] The anti-referral provision was added by Section 8 of the Act of July 2, 1993, P.L. 190, and provides:

> Notwithstanding any other provision of law, it is unlawful for a provider to refer a person for laboratory, physical therapy, rehabilitation, chiropractic, radiation oncology, psychometric, home infusion therapy or diagnostic imaging, goods or services pursuant to this section if the provider has a financial interest with the person or in the entity that receives the referral.  It is unlawful for a provider to

**(Footnote continued on next page…)**

2

## I. BACKGROUND

This matter arises out of Pharmacy's filing of the Applications with the Bureau. (Hearing Officer Decision, Finding of Fact (FOF) ¶ 2.) Insurer replied that the prescriptions were the product of a prohibited self-referral, and the Applications were assigned to Hearing Officer. (*Id.*)[4] The claimant's "treating pain physicians, Drs. Miteswar Purewal and Shailen Jalali, whose office is upstairs from [] Pharmacy, wrote or supervised the prescriptions for the medications at issue. . . . [T]hey acknowledge that they have a financial interest in [] [P]harmacy." (*Id.* ¶¶ 3, 11.)

A hearing was held on October 15, 2019. (*Id.* ¶ 5.) Pharmacy's founder and co-owner Phillip Shin testified that he also owns and serves as managing member of an employee leasing company called Induction Works, which employs the pharmacists who work at Pharmacy, as well as a management company called Medicine Works,[5] "which set up the pharmac[ies] and administers the same." (*Id.*)[6] Medicine Works undertakes the administrative work of the pharmacies and receives a fee from them. (*Id.*) If a physician needs to communicate with Pharmacy, that physician would communicate with Pharmacy, not Induction Works. (*Id.*)

---

enter into an arrangement or scheme such as a cross-referral arrangement, which the provider knows or should know has a principal purpose of assuring referrals by the provider to a particular entity which, if the provider directly made referrals to such entity, would be in violation of this section. No claim for payment shall be presented by an entity to any individual, third-party payer or other entity for a service furnished pursuant to a referral prohibited under this section.

77 P.S. § 531(3)(iii).

[4] This matter was originally assigned to Hearing Officer Barry Keller who became unavailable after the close of the record, at which point it was reassigned to Hearing Officer Torrey. (FOF ¶ 2.)

[5] Though in his first reference to this entity the Hearing Officer called it "Medical Works," it appears he refers to the same entity throughout as "Medicine Works."

[6] Shin also founded Armour Pharmacy and Omni Pharmacy. (FOF ¶ 5.)

3

In March 2019, Pharmacy and Induction Works became parties to a contract formalizing an "employee leasing" arrangement, which, according to Shin, allowed for a more efficient operation and provided tax benefits. (*Id.*) According to that agreement, which refers to Pharmacy as Lessee and Induction Works as Lessor,

> [a]ll Assigned Personnel shall be considered employees of Lessee. Lessee shall have the exclusive right to control and direct the employment of the Assigned Personnel, not only as to the result to be accomplished . . . but also as to the details and means by which that result is accomplished.

(*Id.* ¶ 8; Reproduced Record (R.R.) at 168a.) Induction Works advertises for open positions and manages payroll, but Pharmacy controls the pharmacists' daily work. (FOF ¶ 5.) As Shin sees it, the individuals who work at Pharmacy "are employed by Induction Works on behalf of the pharmacies." (*Id.*)

Shin refers to Induction Works as a pass-through entity, which employs all pharmacists and other personnel for Pharmacy, and which has a "billing team" of about six individuals, supervised by Shin's brother, Michael Shin (M. Shin). (*Id.* ¶¶ 5-6.) The "billing team sends out bills, and then submits fee review applications[,] when payment is not made[,] 'on behalf[]' of [] Pharmacy" and the other pharmacies. (*Id.* ¶ 5 (quoting Hr'g Tr. at 51, R.R. at 13a).) Jason Chong (Pharmacist), the licensed pharmacist who prepared the prescriptions at issue in this case, works for Pharmacy but is "nominally employed by Induction Works" and his Induction Works paycheck is "funded by [P]harmacy." (*Id.* ¶¶ 5, 9.) According to the Induction Works LLC Payroll Summary, Pharmacist works 40 hours per week for Induction Works. (*Id.* ¶ 7.) When pharmacists perform work for a given pharmacy, they log into the system specific to that pharmacy, and they dispense the medication. (*Id.* ¶ 5.)

4

In Shin's view, "'[i]t's the . . . pharmacist actually who controls the pharmacy,'" though, as the Hearing Officer pointed out as "inconsistent[], it is also true that the pharmacy controls the pharmacist." (*Id.*) Shin testified that Induction Works is not responsible for ordering the medications, as that is the responsibility of the pharmacies. (*Id.*) To fire a pharmacist, the pharmacy would notify Induction Works, which would process the firing. (*Id.*) Shin testified that the pharmacies do not "prepare drugs at one central location and then relabel them to make it appear as though they were prepared [] somewhere else[,]" though "sometimes the Induction Works pharmacists will cover for each other." (*Id.* (citing Hr'g Tr. at 77, 83-84, R.R. at 20a-21a).)

Shin founded the other pharmacies, but "he **owns** only [] Pharmacy" and testified that he is not part of management at Omni or Armour pharmacies. (*Id.* (emphasis in original).) However, "Shin is involved with all of the enterprises, so often he is in fact dealing with **himself**. For example, if [] Pharmacy needed to hire a pharmacist, it would go to . . . Induction Works. But [] Shin manages [] Pharmacy and runs Induction Works as well." (*Id.* (emphasis in original).)

The Hearing Officer credited Shin's testimony that Pharmacy, "which is staffed with a Commonwealth-licensed pharmacist, is a pharmacy operating legitimately in that role." (*Id.* ¶ 10.) That Pharmacy leases the pharmacist from Induction Works "does not change the critical analysis." (*Id.*) The Hearing Officer also noted that "the authenticity of the pharmacist licenses, and the affiliations of these professionals with their pharmacies, has not been challenged." (*Id.*) Further, "reliable documentation exists that shows that [P]harmacist [] is, as set forth in the [Health Care Facilities Act (]HCFA[)[7]] billing forms, laboring as a pharmacist for []

---

[7] Act of July 19, 1979, P.L. 130, *as amended*, 35 P.S. §§ 448.101-448.904b.

5

Pharmacy." (*Id.*)  However, the Hearing Officer "found as fact[] that the business of these enterprises is commingled.  For example, . . . [] Shin admit[ted] that he was really dealing with **himself** when considering whether to hire or fire a pharmacist." (*Id.* (emphasis in original).)  The Hearing Officer again turned to the fact that, on direct examination, Shin testified both that the pharmacist controlled the pharmacy but that the pharmacy controls the pharmacist, as "speak[ing] loudly to the commingling of these various enterprises." (*Id.*)  Indeed, "Shin is the key player in all of these enterprises; the notion that they are operated in any type of discrete matter is at odds with common sense and implausible in the extreme." (*Id.*)  Therefore, the Hearing Officer discredited any of Shin's testimony "that meaningful firewalls exist between" the entities but did credit M. Shin's testimony that billing employees "are laboring at the billing and fee review application process on behalf of the various pharmacies." (*Id.*)  The Hearing Officer "found as fact, that M[.] Shin and his team, though nominally employees of Induction Works, are acting as agents of [] Pharmacy." (*Id.*)

The Hearing Officer made the following conclusions of law.  First, Pharmacy met its burden of proving it had standing to initiate a fee review application. (Hearing Officer Decision, Conclusion of Law (COL) ¶ 3; FOF ¶ 10.)  Second, the Hearing Officer concluded that Insurer met its burden of proving a prohibited self-referral because Dr. Purewal, the physician who wrote the prescriptions, has an admitted financial interest in Pharmacy.  (COL ¶ 4.)  In so concluding, the Hearing Officer explained that although pharmacists and pharmaceutical supplies are not specifically mentioned in the anti-referral provision, "it does reference 'goods and services,' and this term plainly captures prescriptions for medications." (*Id.*)  The Hearing Officer found further support for this interpretation in the fact that

employers must provide payment for "'medicines and supplies, as and when needed.'" (*Id.* (quoting Section 306(f.1)(1)(i) of the Act, 77 P.S. § 531(1)(i)).) "In light of this **foundational** liability principle" the Hearing Officer reasoned, "it is unsatisfactory to believe that medications are not included in the phrase, 'goods and services.'" (*Id.* (emphasis in original).) The Hearing Officer also noted that in adopting its Medical Cost Containment Regulations, 34 Pa. Code § 127.301(c), which explicitly incorporate the Safe Harbor exceptions to the Stark Amendments to the Medicare Act,[8] 42 U.S.C. § 1395nn, the Department of Labor and Industry (Department) "made clear that the legislature . . . was intending for [the anti-referral provision] to put into practice the [] Stark Amendments." (*Id.*) The Medicare regime prohibits self-referral with respect to medications. (*Id.*) The Hearing Officer, acknowledging Insurer's argument that the regulation was at odds with the Act, noted that he could not ignore the regulations, and that the Supreme Court approved of the regulations in *Eighty-Four Mining Co. v. Three Rivers Rehabilitation*, *Inc.*, 721 A.2d 1061, 1066-67 (Pa. 1998). (*Id.*) Accordingly, the Hearing Officer ordered the Applications denied and dismissed as deriving from a prohibited self-referral.

Insurer filed a timely petition for review of the Hearing Officer's decision with this Court, arguing the anti-referral provision does not cover drugs and pharmaceutical services. Insurer also filed a timely petition for review, arguing Pharmacy lacks standing to bring a fee review application in the first instance. The parties having briefed their respective positions, these cross-petitions for review are ripe for disposition.[9]

---

[8] 42 U.S.C. §§ 1395c-1395*lll*.

[9] Under Section 704 of the Administrative Agency Law, 2 Pa.C.S. § 704, we are to affirm the decision of a fee review hearing officer unless we determine that decision violated constitutional rights, contained facts unsupported by substantial evidence, or was not in accordance **(Footnote continued on next page…)**

7

## II. DISCUSSION

### A. *Standing as a Provider*

#### 1. Parties' Arguments

Insurer argues that because Pharmacist is employed by Induction Works, an employee leasing company, and because employee leasing companies are not providers under Section 109 of the Act, Pharmacy is not a provider. It points out that the Applications were signed by "Robert Choi"; according to Insurer, there is no evidence that the filers of the Applications were employees of Pharmacy. Section 306(f.1)(5) specifically limits the filing of fee review applications to providers. Insurer cites to this Court's unreported opinion in *Prescription Partners, LLC v. Bureau of Workers' Compensation Fee Review Hearing Office (Healthsmart Casualty Claims Solutions)* (Pa. Cmwlth., No. 2107 C.D. 2014, filed September 30, 2015), and notes that "mercenary assignee[s]" are not providers with standing, (Insurer's Brief (Br.) at 21). It also points to regulations that specifically use the term provider when referring to those who may file fee review applications. 34 Pa. Code § 127.251. Insurer assumes Robert Choi is an employee of Induction Works, and thus not a provider capable of filing a fee review application. (Insurer's Br. at 23.)

Pharmacy rejoins that this Court has "affirm[ed] that pharmacies are providers entitled to reimbursement for prescriptions dispensed to injured workers under the Act." (Pharmacy's Second Br. at 17.)[10] Moreover, Pharmacy argues that the

___

with law. *Walsh v. Bureau of Workers' Comp. Fee Rev. Hearing Off. (Travelers' Ins. Co.)*, 67 A.3d 117, 120 n.5 (Pa. Cmwlth. 2013). Our review of questions of law is de novo. *Sedgwick Claims Mgmt. Servs., Inc. v. Bureau of Workers' Comp. Fee Rev. Hearing Off. (Piszel & Bucks Cnty. Pain Ctr.)*, 185 A.3d 429, 433 n.2 (Pa. Cmwlth. 2018).

[10] Consistent with Pennsylvania Rule of Appellate Procedure 2136, Pa.R.A.P. 2136, Pharmacy as Designated Petitioner styled this brief as its "Second Brief."

Hearing Officer correctly concluded that Insurer did not meet its burden to demonstrate that Pharmacy is not a provider. It argues that the employee leasing agreement does not undermine that conclusion, as it ensures a more efficient operation based on economies of scale, and is similar to a professional employer organization, citing *All Staffing, Inc. v. Commonwealth*, 10 A.3d 389 (Pa. Cmwlth. 2010). Pharmacy points to the employee leasing agreement, which provides that Pharmacy directs the employees leased by Induction Works. Pharmacist, according to Pharmacy, was acting on behalf of Pharmacy when he dispensed medications, and Induction Works was acting on behalf of Pharmacy in submitting the Applications; therefore, Pharmacy was a provider entitled to payment under the Act.

### 2. Applicable Law

The Act requires employers to pay for "reasonable surgical and medical services, services rendered by physicians or other health care providers, including . . . medicines and supplies, as and when needed." 77 P.S. § 531(1)(i). Employers must pay providers' bills within 30 days of receiving them unless they dispute the "reasonableness or necessity of the treatment provided" by way of utilization review. 77 P.S. § 531(5). "Where a provider does not receive payment within 30 days (and payment has not been stayed by an employer's utilization review request), it has recourse. The provider may file a fee review [application] under Section 306(f.1)(5) of the Act." *Armour Pharm. v. Bureau of Workers' Comp. Fee Rev. Hearing Off. (Wegman's Food Mkts., Inc.)*, 206 A.3d 660, 665 (Pa. Cmwlth. 2019) (en banc). A

9

"provider"[11] may file a fee review application, and the Act defines provider as "health care provider," which in turn is defined as

> **any person**, corporation, facility or institution **licensed** or otherwise authorized **by the Commonwealth** to provide health care services, including, but not limited to, any physician, coordinated care organization, hospital, health care facility, dentist, nurse, optometrist, podiatrist, physical therapist, psychologist, chiropractor or **pharmacist** and an officer, employe **or agent of such person acting in the course and scope of employment or agency related to health care services.**

77 P.S. § 29 (emphasis added).

"[T]he Bureau of Workers' Compensation has created the Medical Fee Review Section to review provider complaints of untimely or inadequate payment, and it has created the Fee Review Hearing Office to conduct an evidentiary hearing on the validity of a fee review determination." *Armour Pharm.*, 206 A.3d at 670. "[W]here the employer [or insurer] challenges a fee determination of the Medical Fee Review Section for the stated reason that the medical service was not rendered by a 'provider' within the meaning of the Act, that threshold question must be decided by the Hearing Office[r]." *Id.* "The insurer [] ha[s] the burden of proving by a preponderance of the evidence that it properly reimbursed the provider." 34 Pa. Code § 127.259(f); *Federated Ins. Co. v. Summit Pharm. (Bureau of Workers' Comp. Fee Review Hearing Off.)*, 308 A.3d 329, 333 (Pa. Cmwlth. 2024).

### 3. Analysis

Insurer argues that Pharmacy is not a provider with standing to seek fee review. Section 109 does not limit its definition of "provider" to entities employing

---

[11] Consistent with the statutory text calling for "[a] provider" to "file an application for fee review," 77 P.S. § 531(5), the relevant regulation provides that "[a] provider . . . shall have standing to seek review of the fee dispute by the Bureau." 34 Pa. Code § 127.251.

10

professionals in a particular fashion, nor to professionals having a specific type of employment relationship with an entity. Rather, it includes within its definition "any person[ or] corporation . . . licensed . . . by the Commonwealth to provide health care services," which specifically mentions "pharmacist[s]" and their "agent[s]." 77 P.S. § 29. The Hearing Officer found that "[] Pharmacy, which is staffed with a Commonwealth-licensed pharmacist, is a pharmacy operating legitimately in that role." (FOF ¶ 10.) In addition, the Pharmacy license of record says "Pharmacy" under "License Type," with Pharmacy and Pharmacist listed immediately thereunder. (R.R. at 180a.) The Applications at issue in this case show Pharmacy as the **provider** requesting fee review, having dispensed the prescriptions at issue through Pharmacist, despite Choi being the individual having signed the fee review application on behalf of Pharmacy. (FOF ¶ 10; *see also, e.g.*, R.R. at 33a.) Further, we note that Section 109 specifically includes **agents** of a provider within the definition of provider. 77 P.S. § 29. Here, the Hearing Officer also found that Induction Works and its billing team were acting on behalf of, and as agents of, Pharmacy. (FOF ¶ 10.) We discern no error in the Hearing Officer's conclusion that Pharmacy is a provider given the amply supported factual findings not contested on appeal that Pharmacy is "a pharmacy operating legitimately in that role." (*Id.*)

*Prescription Partners* does not compel a different result. While the hearing officer in that case did conclude that the entity at issue there—in the Hearing Officer's view, an assignee—did not have standing to bring a fee review application, this Court, applying then-applicable precedent, vacated and remanded. Under the now-overruled *Selective Insurance Company of America v. Bureau of Workers' Compensation Fee Review Hearing Office (The Physical Therapy Institute)*, 86 A.3d 300 (Pa. Cmwlth. 2014), *overruled by Armour Pharmacy*, 206 A.3d 660, the

11

question whether a given entity amounted to a provider could **not** be decided in the fee review process. Accordingly, *Prescription Partners* is no longer good law. However, even if we were to apply the hearing officer's logic from *Prescription Partners*, we would still find the case distinguishable. There, "[the p]rovider did not bill [the e]mployer directly for the medications dispensed to [the c]laimant but instead **assigned** the claim to [a third-party entity]." *Prescription Partners*, slip op. at 2 (emphasis added). Here, by contrast, the Hearing Officer made no finding that Pharmacy had assigned its claim to payment but rather found that Pharmacy was operating as a pharmacy, and that its billing operations were appropriately done via an agent, here, Induction Works. (FOF ¶¶ 2, 10.) In sum, we agree with Pharmacy that it is a provider with standing to initiate a fee review application.

### B. Anti-Referral Provision

We next turn to whether the Hearing Officer properly denied and dismissed the Applications on the basis of the anti-referral provision.

#### 1. Parties' Arguments

Pharmacy argues the text of the anti-referral provision applies only to those entities specifically enumerated in the Act, and because Section 306(f.1)(3)(iii) does not specifically list pharmacies or pharmaceuticals, the anti-referral provision does not encompass them. Accordingly, in Pharmacy's view, a physician may refer patients to a pharmacy in which that physician retains a financial interest. Under that logic, the Department's regulations cannot apply the self-referral prohibition against pharmacies because doing so would be contrary to the Department's enabling statute. *Stanish v. Workers' Comp. Appeal Bd. (James J. Anderson Constr. Co.)*, 11 A.3d 569, 575 (Pa. Cmwlth. 2010). Pharmacy points to the fact that Section

12

306(f.1)(3)(vi) specifically refers to drugs and pharmaceutical services in discussing reimbursement. Because the General Assembly made a choice not to cover pharmacies in the anti-referral provision, Pharmacy urges the Court "that it must 'decline to do judicially what the legislature did not do legislatively.'" (Pharmacy's Br. at 16 (quoting *Vlasic Farms, Inc. v. Pa. Lab. Rels. Bd.*, 777 A.2d 80, 83 (Pa. 2001)).) It argues that *Fonner v. Shandon, Inc.*, 724 A.2d 903 (Pa. 1999), supports its interpretation because "where the legislature includes specific language in one section of a statute and excludes it from another section, the language may not be implied where excluded." (Pharmacy's Br. at 20 (quoting *Commonwealth v. Mazzetti*, 44 A.3d 58, 67 (Pa. 2012) (quoting *Fonner*, 724 A.2d at 907)) (emphasis omitted).)

Pharmacy would have this Court reject the Hearing Officer's reliance on the Medicare regulations and the notion that "goods or services" includes medications. Pointing to Section 1903 of the Statutory Construction Act of 1972 (Statutory Construction Act), 1 Pa.C.S. § 1903, "the 'general words' 'goods or services' must be read in light of the preceding particular words[.]" (Pharmacy's Br. at 21-22.) None of the preceding words, according to Pharmacy, "includes[,] or can reasonably be viewed as encompassing, pharmaceuticals, prescription drugs, or pharmaceutical services." (*Id.* at 22.) Further, medications are not goods but rather are "drugs" as defined by Section 102 of the Pharmacy Act, 63 P.S. § 390-2.[12] Because no Pennsylvania statute explicitly defines goods or services as including medications, "this Court must conclude that the General Assembly made an affirmative act by not including 'pharmacy' in the self-referral provision." (*Id.* at 26-27.) Moreover, a pharmacy is not a laboratory, according to Pharmacy, pointing to Section 2 of The

___

[12] Act of September 27, 1961, P.L. 1700.

13

Clinical Laboratory Act, 35 P.S. § 2152,[13] which defines clinical laboratory in a way that would not include pharmacies.[14] Pharmacy would also have us look to legislative history, specifically the introduction of proposed legislation in 2017 that would have amended the Act to include pharmacy in the self-referral proscription. Finally, Pharmacist asserts that the Hearing Officer erred in his reliance on the Stark Amendments and *Eighty-Four Mining Company* because the Act does not mention the Stark Amendments, and *Eighty-Four Mining Company* had to do with an entity specifically mentioned by the Act with respect to self-referral.

Insurer, for its part, echoes the Hearing Officer's view that given the "**foundational** liability principle" that employers must pay for "'medicines and supplies, as and when needed,'" "it is objectionable to believe that medications are not included in the phrase 'goods and services.'" (Insurer's Br. at 13 (quoting 77 P.S. § 531(1)(i)) (emphasis in original).) Further, it points to the anti-referral provision, which seeks to "contain costs by preventing physicians from acting in their own self-interest." (*Id.* (quoting *Eighty-Four Mining Co.*, 721 A.2d at 1067).) Insurer further observes that under the federal Stark Amendments, self-referrals for prescription drugs are explicitly **not** permitted. Insurer points to the interim 1993 regulations cited in *Eighty-Four Mining Company* for the proposition that there has

---

[13] Act of September 26, 1951, P.L. 1539, *as amended*.

[14] The Clinical Laboratory Act defines clinical laboratory as

[a]ny place, establishment or institution organized and operated primarily for the performance of all or any bacteriological, biochemical, microscopical, serological, or parasitological tests by the practical application of one or more of the fundamental sciences to material originating from the human body, by the use of specialized apparatus, equipment and methods, for the purpose of obtaining scientific data which may be used as an aid to ascertain the state of health.

35 P.S. § 2152.

14

been "a generalized disfavor for self-referral schemes, even before specific regulations [were] promulgated." (*Id.* at 16.) Insurer argues the medications prescribed by the physicians here, whom Pharmacy conceded have a financial interest in Pharmacy, are goods or services to which the self-referral prohibition applies. In addition, Insurer points out that Pharmacy has conceded that it is not protected by the Stark Amendments. Insurer also points out that the medications at issue here are compounding creams, such that the **service is the compounding**, and **the good is the cream** itself.

In its Second Brief, Pharmacy argues that the plain language of the anti-referral provision does not cover pharmacies but rather only the entities specifically enumerated. Further, the Department in adopting its regulations did not incorporate the Stark Amendments in their entirety but rather only the **exceptions**. In addition, it reminds us that courts may not add statutory language that does not exist, and that we must respect the General Assembly's policy choice in the anti-referral provision.

### 2. Applicable Law

The anti-referral provision provides in relevant part that "it is unlawful for a provider to refer a person for laboratory, physical therapy, chiropractic, radiation oncology, psychometric, home infusion therapy or diagnostic imaging, goods or services pursuant to this section if the provider has a financial interest with the person or in the entity that receives the referral." 77 P.S. § 531(3)(iii). In its last sentence, the anti-referral provision states that "[n]o claim for payment shall be presented by an entity to any individual, third-party payer or other entity for a service furnished pursuant to a referral prohibited under this section." *Id.* In its regulations, the Department provides that "a provider may not refer a person for certain treatment

15

and services if the provider has a financial interest with the person or in the entity that receives the referral." 34 Pa. Code § 127.301(a). The regulations also incorporate "safe harbors," drawn from federal law:

> [r]eferrals permitted under all present and future Safe Harbor regulations promulgated under the Medicare and Medicaid Patient Program Protection Act [(Anti-Kickback statute)] at 42 U.S.C.[] § 1320a-7b[(b)](1) and (2), published at 42 C[.]F[.]R[.] 1001.952 (relating to exceptions[, Anti-Kickback Regulations)[15]]), and all present and future exceptions to the Stark [A]mendments to the Medicare Act at 42 U.S.C.[] § 1395nn, and all present and future regulations promulgated thereunder **are not** prohibited referrals involving financial interest. An insurer may not deny payment to a health care provider involved in such transaction or referral.

34 Pa. Code § 127.301(c) (emphasis added). The Hearing Officer relied in part on the Stark Amendments, which explicitly prohibit self-referral arrangements involving "designated health services," 42 U.S.C. § 1395nn(a)(1)(A), including "[o]utpatient prescription drugs[,]" 42 U.S.C. § 1395nn(h)(6)(J). "Congress also provided several exceptions to the self-referral ban in the Stark Amendments, which permitted a range of traditional business practices to continue." *Eighty-Four Mining Co.*, 721 A.2d at 1064.[16]

---

[15] The Anti-Kickback statute, aimed at "combat[ting] fraud and abuse in the Medicare and Medicaid programs," *United States v. Neufeld*, 908 F. Supp. 491, 493 (S.D. Ohio 1995), criminalizes "offer[ing], pay[ing], solicit[ing], or receiv[ing] remuneration in order to induce business reimbursed under" Medicare or Medicaid, 56 Fed. Reg. § 35952-01. The Anti-Kickback Regulations exempt certain categories of business transactions from criminal prosecution.

[16] "The exceptions generally fall into three broad categories: (1) exceptions relating to both ownership or investment interests and compensation arrangements; (2) exceptions relating to ownership or investment interests; and (3) exceptions relating to compensation arrangements." *Eighty-Four Mining Co.*, 721 A.2d at 1064-65.

3. Analysis

Because the issue requires us to decide the meaning of statutory text, we consult the rules of statutory interpretation. "The polestar of statutory construction is to determine the intent of the General Assembly." *Hannaberry HVAC v. Workers' Comp. Appeal Bd. (Snyder, Jr.)*, 834 A.2d 524, 531 (Pa. 2003) (citing Section 1921(a) of the Statutory Construction Act, 1 Pa.C.S. § 1921(a)). The words the General Assembly chose, when "clear and free from all ambiguity . . . are presumed to be the best indication of legislative intent." *Id.* (citation omitted). We may only consult administrative interpretations of a statute when a statute is ambiguous. 1 Pa.C.S. § 1921(c). We consider a statute ambiguous where its text gives rise to "at least two reasonable interpretations." *Warrantech Consumer Prods. Servs., Inc. v. Reliance Ins. Co. in Liquidation*, 96 A.3d 346, 354-55 (Pa. 2014).

We first address Pharmacy's argument that under Section 1903(b) of the Statutory Construction Act, the term "goods or services" must be construed in light of the preceding more specific terms. We have explained that Section 1903(b) was a codification of the *ejusdem generis* canon of construction, which provides that "where general words follow the enumeration of particular classes of persons or things, the general words will be construed as applicable only to persons or things of the same general nature or class as those enumerated." *S.A. by H.O. v. Pittsburgh Pub. Sch. Dist.*, 160 A.3d 940, 946 (Pa. Cmwlth. 2017) (quoting *McClellan v. Health Maint. Org. of Pa.*, 686 A.2d 801, 806 (Pa. 1996) (Opinion in Support of Affirmance)). Typically, the *ejusdem generis* canon involves a "catchall" phrase after a specific enumeration. *See, e.g.*, *S.A.*, 160 A.3d at 944 (interpreting statute defining weapon as "includ[ing] but shall not limited to any knife, cutting instrument, cutting tool, explosive . . . **and any other** tool, instrument[,] or

17

implement capable of inflicting serious bodily injury"); *McClellan*, 686 A.2d at 804-05 (interpreting statute defining professional health care provider as "**including but not limited**" to a list of items and ending with "**or other** health care facility" (second emphasis added)).[17] The use of a general term followed by "including" can also trigger the *ejusdem generis* canon. *Dep't of Env't Prot. v. Cumberland Coal Res., L.P.*, 102 A.3d 962, 975-76 (Pa. 2014) (applying *ejusdem generis* to statute that defined "unanticipated event" as "including" a list of enumerated items).[18]

The anti-referral provision does not begin with "including," nor does it end with "**or other** goods or services," or "**any other** goods or services," like the paradigmatic examples discussed above. However, we do not believe the lack of this language precludes a reading of "goods or services" as a catchall, especially where Pharmacy's *ejusdem generis* argument is predicated on that assumption, as is Insurer's argument that "goods or services" is sufficiently broad to include drugs

---

[17] The Sutherland treatise explains that

> [e]*jusdem generis* is a common drafting technique designed to save a legislature from spelling out in advance every contingency in which a statute could apply. When foreseeable circumstances are too numerous or varied for particular enumeration, a legislature may employ *ejusdem generis* principles and permissibly rely on courts to give content to a general statutory phrase.

NORMAN SINGER & SHAMBIE SINGER, SUTHERLAND STATUTES & STATUTORY CONSTRUCTION § 47:17 (7th ed. 2023).

[18] The *Cumberland Coal* Court further noted that

> the presence of such a term as "including" in a definition exhibits a legislative intent that the list that follows is not an exhaustive list of items that fall within the definition; yet, any additional matters purportedly falling within the definition, but that are not express, must be similar to those listed by the legislature and of the same general class or nature.

*Cumberland Coal Res.*, 102 A.3d at 976.

and pharmaceutical services. While not conclusive, as this precise question was not before the Court in *Bennett v. Jeld Wen, Inc. (Workers' Compensation Appeal Board)*, 306 A.3d 949 (Pa. Cmwlth. 2023),[19] we note that there, we read the "goods or services" quite naturally as serving as a catchall term to include other types of goods or services not specifically enumerated. In setting forth the statutory language in *Bennett*, we emphasized the language could be read as, "**it is unlawful for a provider to refer a person for . . . goods or services**." *Id.* at 959 (quoting 77 P.S. § 531(3)(iii)). Indeed, it seemed natural there that the "goods or services" language was capable of covering a physician who had a financial interest in the pharmacy filling a compound cream prescription. *Id.* at 961-62. Again, we are cognizant that the precise issue whether "goods or services" was a general term capable of covering drugs was not at issue in *Bennett*, but it serves to confirm that a natural reading of the statutory text encompasses those items. Accordingly, we read the "goods or services" language to suggest the General Assembly did not intend to restrict the anti-referral provision's sweep only to the specific items enumerated but left a broader category open.

We agree with Insurer that drugs are "goods" for the purposes of the anti-referral provision. The Act does not define "goods," but reviewing a dictionary definition of "goods" confirms this reading. The relevant dictionary definition of "goods" when used in the plural is "[t]hings that are produced for sale . . . merchandise, wares . . . economic assets which have a tangible, physical form (contrasted with services)." OXFORD ENGLISH DICTIONARY.[20] We agree with the

---

[19] This Court denied Insurer's Application for Leave to file a Supplemental Brief regarding this Court's decision in *Bennett v. Jeld Wen, Inc. (Workers' Compensation Appeal Board)*, 306 A.3d 949 (Pa. Cmwlth. 2023), insofar as it sought to file a supplemental brief, but granted it to the extent it brought *Bennett* to the Court's attention. (Order, 11/29/23.)

[20] https://doi.org/10.1093/OED/4101948276 (last visited May 15, 2024).

Hearing Officer that it is fair to characterize drugs as the "wares" or "merchandise" of a pharmacy, and a pharmacy no doubt produces drugs "for sale." Certainly, too, they are assets with a "tangible, physical form."[21] Further, in applying the *ejusdem generis* canon as Pharmacy urges, we find that the enumerated items are wide-ranging topics across medical disciplines—from physical therapy to medical imaging to psychometrics. These items are all medical in nature, and drugs and pharmaceutical services fall within the "same general nature or class as those enumerated." *S.A.*, 160 A.3d at 946. Accordingly, we conclude that drugs and pharmaceutical services fall comfortably within the anti-referral provision's "goods or services" catchall, and *ejusdem generis* does not command a contrary reading.

However, Pharmacy also argues the anti-referral provision does not include drugs and pharmaceutical services because "where the legislature includes specific language in one section of the statute and excludes it from another, the language should not be implied where excluded." *Fonner*, 724 A.2d at 907. The application of this canon, sometimes referred to as *expressio unius est exclusio alterius*, is context-dependent and, importantly, "applies only when 'circumstances support a sensible inference that the term left out **must have been meant** to be excluded.'" *Nat'l Lab. Rels. Bd. v. SW Gen., Inc.*, 580 U.S. 288, 302 (2017) (citation omitted) (emphasis added). It is true that in Section 306(f.1)(3)(vi)(A) of the Act, added at the same time as the anti-referral provision, the General Assembly specifically referenced reimbursement for "drugs and professional pharmaceutical services[,]" capping reimbursement for the foregoing at 110% of their average wholesale price. 77 P.S. § 531(3)(vi)(A) (AWP provision). However, having concluded that "goods

---

[21] Pharmacy suggests that drugs dispensed by licensed pharmacies are not goods because the Pharmacy Act defines drugs in a specific way. 63 P.S. § 390-2. However, that another statute defines "drug" does not overcome the fact that drugs can also count as goods.

or services" is sufficiently broad to cover drugs and pharmaceutical services, we do not believe the *inclusio unius* rule applies, as the General Assembly **did** include drugs and pharmaceuticals in the anti-referral provision despite not using those precise terms. Then, when it needed to be more precise about the exact types of goods and services to which it intended to refer in the AWP provision, it used those terms.

In addition, we must reject the legislative history offered by Pharmacy, as it is of no moment that the General Assembly **may** have contemplated inserting the word "pharmacy" into the list of items enumerated in the anti-referral provision.[22] While Pharmacy would have us infer from that a recognition on the part of the General Assembly that the text of the anti-referral provision does not already encompass drugs and pharmaceutical services, that is not the only inference one could draw. Indeed, the legislator who proposed that addition may simply have desired to clarify what the law already covered, or may have operated under the mistaken view that "goods or services" did not already cover drugs or pharmaceutical services. In any event, the General Assembly chose a term broad enough to encompass the items at issue here. What is more, we are not to consider legislative history of any variety unless we have concluded the statute is ambiguous. 1 Pa.C.S. § 1921(c)(8); *see also Bostock v. Clayton County*, 590 U.S. 644, 670 (2020) (concluding a statute already encompassed categories Congress had

---

[22] In addition, the specific amendment to House Bill 18 of the 2017-18 Regular Session of the Pennsylvania House of Representatives reproduced in Pharmacy's brief, (Pharmacy's Br. at 29), does not appear in the official history of that proposed legislation. https://www.legis.state.pa.us/cfdocs/billInfo/billInfo.cfm?sYear=2017&sInd=0&body=H&type=B&bn=18 (last accessed May 15, 2024).

considered inserting several times in the past, rejecting reliance on subsequent legislative history).[23]

Having concluded the plain text of the anti-referral provision covers drugs and pharmaceutical services, we return to the Applications in dispute. Pharmacy does not dispute on appeal the Hearing Officer's finding that the prescribing physician here had a financial interest in Pharmacy. (FOF ¶ 3.) Accordingly, we conclude that underlying the Applications is a "provider [who] refer[red] a person for . . . goods or services" and "the provider has a financial interest . . . in the entity that receive[d] the referral." 77 P.S. § 531(3)(iii). Therefore, the Hearing Officer properly denied and dismissed the Applications because they originate from a prohibited self-referral.[24]

## III. CONCLUSION

For all the foregoing reasons, we affirm the Hearing Officer's decision.

_____
**RENÉE COHN JUBELIRER,** President Judge

---

[23] "All we can know for certain is that speculation about why a later Congress declined to adopt new legislation offers a 'particularly dangerous' basis on which to rest an interpretation of an existing law a different and earlier Congress did adopt." *Bostock*, 590 U.S. at 670.

[24] Because we read the "goods or services" language of the anti-referral provision as plainly covering drugs and pharmaceutical services, we do not reach the remaining issues.

# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

700 Pharmacy, : CASES CONSOLIDATED
           Petitioner :
            :
         v. :  No. 560 C.D. 2020
            :
Bureau of Workers' Compensation :
Fee Review Hearing Office (State :
Workers' Insurance Fund), :
           Respondent :


State Workers' Insurance Fund, :
           Petitioner :
            :
         v. : No. 617 C.D. 2020
            :
Bureau of Workers' Compensation Fee :
Review Hearing Office (700 Pharmacy), :
           Respondent :


# O R D E R

NOW, May 16, 2024, the Order of the Bureau of Workers' Compensation Fee Review Hearing Office, in the above-captioned matter, is **AFFIRMED**.


           _____

           **RENÉE COHN JUBELIRER,** President Judge